UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 2, 2014

------------------------------------------------X
                                                :
In re                                           :        13 Civ. 7625 (KPF)
                                                :
TRIBECA MARKET, LLC, *et al.,*                  :        OPINION AND ORDER
                                                :
                Debtors.                        :
                                                :
------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Appellant-Cross-Appellee Pick & Zabicki LLP ("Appellant" or "P&Z") appeals from an order (the "Fee Order") entered in the United States Bankruptcy Court for the Southern District of New York (Glenn, *J.*) awarding fees to P&Z for professional services rendered as counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee" or the "Committee") in *In re Tribeca Market, LLC*, Case No. 11-10737 (MG) (Bankr. S.D.N.Y.).  In particular, the Bankruptcy Court reduced P&Z's fee application by 40 percent, after finding that P&Z had filed (and billed for) multiple court submissions on behalf of the Creditors' Committee without convening a single in-person or telephonic meeting of that Committee — which, in the Court's estimation, raised "serious questions" about P&Z's representation of the Creditors' Committee.  Appellee-Cross-Appellant G.M. Data Corp. ("Appellee" or "GMDC") cross-appeals, arguing that the Bankruptcy Court not only had the discretion to reduce P&Z's fees by 40 percent, but also could, and should, have reduced the fees even further, up to 100 percent.

This Court's review of the record makes plain that the Bankruptcy Court did not abuse its discretion in assessing the reduction. However, because of a minor arithmetic error, the Court will vacate the Bankruptcy Court's order and remand the matter for the limited purpose of correcting the error.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Bankruptcy Petitions

Tribeca Market, LLC ("Tribeca Market") was formed in January 2010 with the same members as a predecessor company, Potato Farms, LLC ("Potato Farms"). (R. 7 at ¶ 3). Tribeca Market took over all of Potato Farms' operations, but the lease remained in Potato Farms' name. (*Id.*).

In response to tax and litigation issues that plagued Potato Farms (R. 7 at ¶ 4), Tribeca Market and Potato Farms (together, "the Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 22, 2011, in the United States Bankruptcy Court for the Southern District of New York (R. 1). Tribeca Market's petition (the "Petition") listed 19 unsecured creditors. (R. 7 at ¶ 5). As relevant to the instant appeal, they

---

[1]    The facts set forth herein are taken from the Bankruptcy Court record provided to the Court by the parties. Citations to "R. [number]" refer to the docket/tab number of the document in the record. When relevant, the docket number is followed by the exhibit number and/or page number, including numbering provided by the Court's electronic case filing (or "ECF") system. Included within the record is the transcript of the July 22, 2013 plan confirmation hearing (the "Confirmation Hearing") before the Bankruptcy Court, which is cited in this Opinion as "Hr'g Tr."

For convenience, the parties' memoranda of law will be referred to as follows: P&Z's opening brief as "P&Z Br."; GMDC's opposition and cross-appeal as "GMDC Opp."; P&Z's reply and opposition to the cross-appeal as "P&Z Reply"; GMDC's reply as "GMDC Reply"; and the amicus brief filed by the U.S. Trustee as "U.S. Trustee Br."

included GM Data Corp., d/b/a GMDC Business c/o the Brown Group, P.C. ("GMDC"); Okey Enterprises, Inc. ("Okey"); and New York Cheese Corp. ("NYCC").  (*Id.*).[2]  According to the Petition, Tribeca Market was indebted to GMDC for $729,466.00, to Okey for $5,933.69, and to NYCC for $3,823.49. (*Id.*).

On March 7, 2011, Debtors' counsel moved for an order authorizing the joint administration of the two Chapter 11 petitions pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  (R. 8).  Presiding Bankruptcy Judge Martin Glenn issued the joint administration order on April 26, 2011. (R. 28).

**2.      The Establishment of the Creditors' Committee**

Section 1102 of the Bankruptcy Code provides that "as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims …."  11 U.S.C. § 1102(a)(1).  A creditors' committee aids, assists, and monitors the debtors to ensure that the unsecured creditors' views are heard and their interests are promoted and protected.  *See generally Pan Am Corp.* v. *Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994).

On March 29, 2011, pursuant to Section 1102, the United States Trustee for Region 2 (the "U.S. Trustee") appointed a three-member Creditors' Committee for the Debtors' bankruptcy proceeding, comprising representatives

---

[2]      In the Petition, NYCC is listed as "New York Cheese & Natural."  (R. 7 at 4).  The record demonstrates that both names are used to refer to that company.  (R. 22).

of GMDC, Okey, and NYCC.  (R. 22).  Rodney Brown served as GMDC's counsel

(R. 326); Jeeil Choi served as NYCC's counsel (R. 324); and Lawrence Morrison

served as Okey's counsel (R. 33, 323).[3]

### 3.    The Committee's Ability to Retain Professionals

The Federal Rules of Bankruptcy Procedure further provide that "[a]n

order approving the employment of attorneys, accountants, appraisers,

auctioneers, agents, or other professionals ... shall be made only on application

of the trustee or committee."  Fed. R. Bankr. P. 2014(a).  Specifically, under

Section 328, the Committee or a trustee

> may employ or authorize the employment of a professional person
> under § 327 [by trustee request] or § 1103 [by committee request] ...
> as the case may be, on any reasonable terms and conditions of
> employment, including on a retainer, on an hourly basis, on a fixed
> or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a).

However appointed, professionals retained to assist the parties in a

bankruptcy proceeding are subject to various limitations under the Bankruptcy

Code.  Among other things, professionals who represent the Committee must

not represent adverse interests while they are employed by the Committee:

> An attorney or accountant employed to represent a committee
> appointed under section 1102 of this title may not, while employed
> by such committee, represent any other entity having an adverse
> interest in connection with the case.

11 U.S.C. § 1103(b).  Section 327 similarly states that the professionals a

trustee employs must not "hold or represent an interest adverse to the estate,

---

[3]    Avrum Rosen, of the Law Offices of Avrum J. Rosen, PLLC, was subsequently retained
on October 28, 2011, as GMDC's bankruptcy counsel.  (R. 96, 325).

and [must be] disinterested persons." 11 U.S.C. § 327(a); *see also* Fed. R. Bankr. P. 2014 (requiring applicants to detail all connections with the parties and parties in interest).[4]

### 4. The Committee's Meetings and Retention of P&Z

The Creditors' Committee first met on April 14, 2011, at the office of Rodney Brown, counsel to GMDC. During the meeting, Douglas K. Pick, a partner at P&Z, offered P&Z's services as counsel for the Committee. (R. 322, 323, 324).[5] Each committee member and his respective attorney attended this meeting. (*Id.*).

A second Creditors' Committee meeting was conducted on May 2, 2011, at the Law Offices of Yoon & Kim, LLP, counsel to NYCC. Again, each committee member and his respective attorney attended. (R. 35, 322). Although no P&Z representative was present at this meeting, the Creditors' Committee voted to retain that firm as counsel by a vote of 2 to 1, with GMDC objecting to P&Z's retention. (R. 311, 322-324, 326). On or about May 3, 2011, Pick was informed that the Committee had selected P&Z as its counsel, and also that it had elected the NYCC representative to serve as the Chairman of the Committee. (R. 326). As counsel to the Creditors' Committee, P&Z

---

[4]     Section 328 has a similar provision, but goes further in empowering a court to alter compensation as a sanction for non-disclosures. *See* 11 U.S.C. § 328(c). Despite this seemingly more comprehensive (and ongoing) disclosure requirement, GMDC has not based its arguments on this section, but rather advances arguments only under Section 327 and Federal Rule of Bankruptcy Procedure 2014.

[5]     Both parties agree that the Creditors' Committee met twice. The parties disagree about the date of the first meeting. P&Z states that the meeting occurred "on or about April 14, 2011" (R. 322), whereas GMDC contends that the meeting took place on April 4, 2011 (R. 326). The precise date is not relevant to resolution of the instant appeal.

would "represent the Committee with regard to all of its interests in the Debtor's Chapter 11 case." (R. 35 at ¶ 2).

On May 2, 2011, the same day P&Z was elected as counsel for the Creditors' Committee, the NYCC representative, in his capacity as Chairman, filed an "Application for Authority to Retain Pick & Zabicki, LLP, *nunc pro tunc*, as Counsel to the Official Committee of Unsecured Creditors" pursuant to Section 1103. (R. 35). In the application, the Chairman explained that the Committee required P&Z's services and Chapter 11 expertise to, among other things, (i) advise and assist the Committee with respect to its rights, duties, and powers in the case; (ii) assist the Committee in its analysis and negotiations with the Debtor or third parties; and (iii) review and analyze all applications, orders, statements of operations, and schedules filed with the Bankruptcy Court and advise the Committee as to their propriety. (*Id.* at ¶ 4). P&Z agreed to bill at the firm's standard hourly rates of $335.00 to $405.00 for partners, $250.00 for associates, and $125.00 for paraprofessionals. (*Id.* at ¶ 8).

In his affidavit in support of the application to retain P&Z, Pick attested that P&Z "has not represented any of the parties related to the Debtor, its creditors and other parties-in-interest," and that it "has not, does not, and will not represent any of the Debtor's creditors or any other entity other than the [Creditors'] Committee in matters related to this case." (R. 35 at ¶ 6). In a supplemental affidavit filed two days later, on May 4, 2011, Pick retreated from his original averments, and stated instead that "[a]lthough P&Z has attempted

to identify all such representations, it is possible that P&Z may have represented certain of the Debtor's creditors or other entities that consider themselves parties-in-interest in matters unrelated to this Chapter 11 case." (R. 37 at ¶ 3).

The Bankruptcy Court authorized the Creditors' Committee's retention of P&Z on July 5, 2011, pursuant to Section 1103(a).  (R. 64).

### 5.    The Debtors' Indictment and the Appointment of a Chapter 11 Trustee

One year later, on July 18, 2012, several individuals affiliated with the Debtors, including their principal, were indicted in connection with alleged tax-related conduct.  (R. 185).  As a consequence of the indictment, on July 24, 2012, the United States Trustee moved for an order to appoint a Chapter 11 trustee to ensure that the Debtors' financial reporting — at least some of which had precipitated the indictment — "would be accurate, honest, and trustworthy."  (*Id.*).[6]  Thereafter, on July 27, 2012, Judge Glenn appointed Janice Grubin as Chapter 11 Trustee (R. 190, 201), at which point P&Z stopped performing services for the Creditors' Committee (R. 280 at ¶ 7; R. 311 at ¶ 11).

---

[6]    In addition to its regular managerial duties, *e.g.*, reviewing applications for compensation requests, *see* 28 U.S.C. § 586(a)(3)(A)(i), the U.S. Trustee may "serve as and perform the duties of a trustee in a case under title 11 when required under title 11 to serve as trustee in such a case," 28 U.S.C. § 586(a)(2).  The U.S. Trustee may also request that a bankruptcy court "order the appointment of a trustee" to oversee Chapter 11 proceedings.  *See* 11 U.S.C. § 1104(a) (allowing appointment "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management … or similar cause" or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate").

### 6.     P&Z's Representation of the Creditors' Committee

As noted, P&Z was retained over GMDC's objection.  (R. 311 at ¶ 16 n.9).
The instant cross-appeals concerning P&Z's fees center on a series of events
that occurred during P&Z's representation of the Creditors' Committee.[7]

### a.     The Failure to Adopt Committee Bylaws

One week after P&Z's retention, on May 9, 2011, Pick sent form bylaws
to the Creditors' Committee members and their attorneys for review.[8]  Brown
responded that he had "reviewed the proposed [bylaws]"; it is unclear from the
record whether he offered any specific criticisms or counterproposals.
Thereafter, Pick requested that Brown advise him of any proposed changes to
the bylaws.  (R. 297, Ex. C).  Brown claims that GMDC did send revisions to
the bylaws, but that they were never considered.  (R. 297 at ¶ 12).[9]

On November 29, 2011, Brown informed Pick that he was unaware if the
bylaws had yet been signed, but "insist[ed]" that there be formal bylaws in the
matter so that "all the members in the Committee are fully aware of their

---

[7]     A comparison of the papers submitted in support of the parties' positions on appeal and
the papers submitted to the Bankruptcy Court demonstrates that the parties present
similar, and in many instances identical, arguments.  (*Compare, e.g.*, R. 298 *with*
GMDC Opp.).

[8]     Neither party indicates whether adoption of Committee bylaws was mandatory or not,
but the record suggests such adoption was a discretionary matter.  (*But cf.* R. 297 at
Ex. A (Rosen insisting that formal bylaws be adopted)).

[9]     The record contains several emails sent between the parties.  There may, of course, be
additional correspondence between the parties that was not included in the record, and
that may address gaps identified by the Court in this Opinion.  The Court must,
however, draw its conclusions from the record provided by the parties.

fiduciary duties." (R. 297, Ex. A).  As of April 9, 2012, counsel for GMDC still

had not received the bylaws.  (*See id.* at Ex. D).[10]

### b. The Retention of Professionals with Limited, if Any, Involvement by GMDC

On June 6, 2011, Pick emailed the attorneys representing the three

Committee members to inform them that he had chosen an accountant and

broker to hire on behalf of the Committee.  (R. 297, Ex. E).  Neither the

Committee members nor their attorneys, however, had weighed in on the

selections.  For this reason, Brown responded, "I thought we had agreed to

interviews [of the professionals]."  (*Id.*).  But while the record indicates that Pick

attempted to schedule interviews, no such interviews were in fact conducted.

(*See* R. 327 at 2).

Brown objected to the fact that GMDC had been denied an opportunity to

interview the hired professionals.  (R. 297 at ¶ 13).  To that point, in an email

dated June 14, 2011, Brown advised Pick, "I do not think that we ever got to

interview any of the brokers or accountants.  You even referred to them as

'friends.'"  (R. 297, Ex. F).  Pick did not dispute that fact, but instead

responded:

> I will not allow one person on the committee with a personal agenda
> to disrupt the full committee.  I will poll the committee on a broker
> and an accountant.  Mr. Morrison has suggested an accountant and
> is [in] agreement for the retention of Mr. Donahue as broker.  I will

---

[10]     Rosen advised the Bankruptcy Court that the bylaws were never circulated again after
Brown's response. (Hr'g Tr. 21).  When the Court asked whether there was ever a vote
approving the bylaws, Pick responded that he did not know: "I didn't concentrate on
going back to my time records to see if we actually [had] a vote." (*Id.* at 49-50).

consult with Mr. Choi and obtain his thoughts now.  If you have a different person in mind then you can call me to discuss.

(*Id.*).  On June 24, 2011, Brown and Pick exchanged emails of a similar tone. Brown noted that, although Pick had submitted an application to retain a particular accountant, GMDC had neither participated in nor voted for the accountant's selection.  (R. 297, Ex. G).  Pick responded, curiously, "The Committee, by their counsel, voted by phone … *I assume that you would have voted no.*"  (*Id.* (emphasis added)).[11]

Even after the accountant and broker were retained, P&Z and GMDC continued to feud over the professionals.  In an email dated October 7, 2011, for example, Brown complained that the broker whom Pick had retained had not produced a buyer and that he (Brown) had not yet seen any written reports or analyses from the accountants.  (R. 297, Ex. I).  The series of emails discussing this point soon changed topics, however, and there is no resolution of those issues mentioned in the record before the Court.

### c.    The Lopsided Proposed Plan

Subsequently, in a series of emails exchanged in October 2011, members of the Creditors' Committee discussed with P&Z the latter's proposed plan of reorganization, in which Committee members Okey and NYCC would receive complete reimbursement of their debts, while GMDC (whose debt was exponentially larger than the combined debt of the other two members of the

---

[11]    Communications of this sort suggest that Pick practiced an unusual form of "shuttle diplomacy," in which he obtained consent for a particular course of action from the other two members of the Creditors' Committee and simply assumed that the GMDC representative would hold a contrary view, thus obviating the need for input (much less consent) from the GMDC representative.

Committee) would only recover 17.5 percent of its debt.  (R. 297, Ex. I).  Pick noted in one email, "I have not received your thoughts to the 17.5 percent other than it is totally unacceptable to you."  (*Id.*).  In response, Brown did not propose any solution or more preferable plan, but rather simply stated, "[The plan] is clearly inequitable, unfair and discriminatory."  (*Id.*).[12]

In a letter dated September 26, 2011, Brown advised Pick that he "vehemently oppose[d] [Pick's] latest and unexpected proposal to sell the business to the Debtor," describing his shock that Pick intended to forego a sale to a higher buyer.  (R. 297, Ex. H; R. 311, Ex. A at 16).  Brown asked Pick to resign as counsel to the Committee.  (*Id.*).  Similarly, in a November 29, 2011 letter, Rosen complained to Pick of a "potential conflict of interest" with the proposed plan of reorganization.  (R. 297, Ex. A).  Pick later explained in an email to Rosen dated April 9, 2012, that "[u]nfortunately, there was not sufficient funds in the case to get your client all the money that it has demanded."  (R. 297, Ex. D).  In that same email, however, Pick complained that "GM[DC] has refused to advise me as to what it would accept to settle its claim under a plan."  (*Id.*).

---

[12]    Judge Glenn apparently agreed:

> The Court: And what happened with that plan?
> Mr. Brown: It didn't go anyplace.
> The Court: That's right.
> Mr. Brown: The Court indicated it was not going to go anyplace....
> The Court: Like I say, you raise an issue with me, and I'll deal with it.

(Hr'g Tr. 47).

#### d.    The Absence of Creditors' Committee Meetings

On June 14, 2011, Pick sent an email to Brown and to the other Committee members' attorneys, Morrison and Choi, in which he said, "We will continue to proceed by majority vote.  We can do calls without doing physical sit down meetings if that is easier for everyone, as I am advised." (R. 297, Ex. F).  Brown responded to this email stating:

> Your statement to me that you will continue to proceed by majority is simply code for the fact that you will continue not to take into account my client's interests.  Your desire to have meetings by telephone is simply part and parcel of your agenda to continue to exclude my client from any meaningful participation on the Creditors' Committee....  I do not believe that the Creditors in question, who have very minor claims, are actually participating in any meaningful way.  At this point I believe that, both ethically and professionally, you should consider resigning as counsel to the Committee.

(R. 311, Ex. A).  Pick responded on the same day, indicating that he would represent the interests of all the creditors and that the Creditors' Committee would function by majority vote.  (*Id.*).  Pick further commented, "We are open to any suggestions/thoughts that you may have and will discuss them with the full committee for a vote if such is required.  You are also free to directly converse with counsel to any member on the Committee." (*Id.*).

As noted, on September 26, 2011, Brown sent a second letter to Pick asking him to resign.  (R. 311, Ex. A).  On the same day, Pick responded in relevant part that, "You [Brown] can always call a meeting of the creditors to discuss the [sale] proposal if you are not happy with it." (*Id.*).

On October 13, 2011, Brown complained that Pick "ha[d] never even called a meeting of the Creditors' Committee," and that he had "made it clear

that [he] only represent[s] the other creditors, and [had] not done anything to represent [GMDC]'s interests." (R. 297, Ex. I).

On November 29, 2011, Avrum Rosen wrote to Pick to advise that he had not received any notification "whatsoever" about any Creditors' Committee meetings and that he had been advised by co-counsel that Pick had not conducted any Committee meetings. (R. 297, Ex. A). Further, Rosen noted his understanding that Pick had had meetings with the other two creditors on the Committee and then called GMDC to advise them of their vote, but did not take into account GMDC's vote. (*Id.*). Rosen also noted that Pick filed a status report with the Bankruptcy Court concerning a proposed reorganization plan without having a Creditors' Committee vote. (*Id.*). Rosen called all of this inappropriate behavior. (*Id.*). Later in the letter, Rosen wrote that all communications with the Creditors' Committee should take place in full meetings, and insisted that minutes be taken, that all parties be given advance notice of the meetings, and that they coordinate all the parties' schedules. (*Id.*).

On April 9, 2012, the attorneys exchanged still more emails in which Rosen lamented the lack of a Creditors' Committee meeting. (R. 297, Ex. D). Pick responded:

> I have no problem in adding anything more you want [to the Disclosure Statement] but must be advised of what you want added. As of this date you have refused to give me your comments and accordingly I will work with counsel to the Debtor and add an update and file a revised Disclosure Statement with the court.... As you know, if you want a sit down Committee meeting or a telephonic

conference call with the Committee to discuss the case all you have
to do is ask and I will see what I can do.

(R. 297, Ex. D).

GMDC's attorneys subsequently relayed their frustrations to the

Bankruptcy Court at the Confirmation Hearing.  For his part, Rosen noted:

> I've sat on a lot of committees.  I've represented a few committees
> and I've sat on probably over 15 committees.  I've never [seen]
> anything like this in my entire career.  The fact of the matter is there
> were no committee meetings; one member of the committee was
> complet[ely] excluded from facts.

(Hr'g Tr. 18).  Rodney Brown, who had been involved with the Creditors'

Committed for a longer period of time, explained:

> We never got to participate in a single real committee meeting, a
> physical presence, people actually exchanging ideas.  That never
> took place.  I am relatively new to bankruptcy.  I couldn't understand
> how creditors who totaled maybe $8,000 were calling the shots in
> this case.

(*Id.* at 45).

### e.    P&Z's Potential Conflicts of Interest

GMDC focuses its cross-appeal on P&Z's purported conflicts of interest,

and the Court will therefore address the putative bases of those conflicts here.

While acting as the Creditor's Committee's counsel, Pick concurrently

represented Morrison (Okey's counsel) in two matters that are unrelated to

each other and to this case.[13]  First, Pick represented Morrison in *Richard E.*

*O'Connell, Esq., as Trustee of the Estate of Sol De Ibiza, LLC* v. *Lawrence F.*

---

[13]    In both matters, Rosen was also involved: he represented the respective Chapter 7
trustee in each case.  (R. 311 at ¶¶ 7, 12).  P&Z was also adverse to Morrison in two
other cases.  (*Id.* ¶ 4 n.6).

14

*Morrison, Esq., The Morrison Law Offices, P.C.* and *Meister Seelig & Fein, LLP*,
Adv. Proc. No. 11-02549 (BRL) ("*Sol De Ibiza*"), for which Pick filed papers on
Morrison's behalf on September 1, 2011.  (R. 311 at ¶¶ 7, 8).  In *Sol De Ibiza*,
P&Z exited as Morrison's counsel on November 2, 2011.  (*Id.* at ¶ 8).  Second,
Pick represented Morrison in a case captioned *In re: MMR Ventures, LLC*, Case
No. 12-71614 (REG) ("*MMR Ventures*").  (R. 297, Ex. B).  In *MMR Ventures*, P&Z
filed a notice of appearance as counsel to Morrison on September 25, 2012.
(R. 311 at ¶ 13).  Three months later, on December 7, 2012, P&Z's
representation of Morrison ceased when it filed a "Stipulation and Order
Substituting Counsel" with the Bankruptcy Court.  (R. 297, Ex. B).  P&Z
received no compensation for either representation.  (R. 311 at ¶¶ 8, 13).

After Rosen informed the U.S. Trustee of P&Z's involvement in *Sol De
Ibiza*, P&Z disclosed this representation to the Bankruptcy Court on October
24, 2011.  (R. 311 at ¶ 10).  Pick conceded that he did not disclose the second
matter to Judge Glenn before July 2013.  (Hr'g Tr. 56).  He argued, however,
that when he became involved in the second case in September 2012, P&Z's
representation of the Creditors' Committee had already terminated, given the
appointment of the Chapter 11 Trustee on July 30, 2012.  (R. 194; Hr'g Tr. 55-
56).  Pick stated that "[i]t was my belief that once the trustee was appointed,
[P&Z's] role as committee counsel stopped."  (Hr'g Tr. 57).[14]

---

[14]   P&Z did not file any papers after Grubin was appointed Chapter 11 Trustee, and its
application requested fees for work completed by July 30, 2012.  (Hr'g Tr. 57-58).  That
stated, the U.S. Trustee was "not aware of any authority that the appointment of a
Chapter 11 trustee would disband the committee."  (*Id.*).  Moreover, both the

### 7.     P&Z's Fee Application and the Objections to It

On June 20, 2013, P&Z submitted the "First and Final Application of Pick & Zabicki LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred" (the "Fee Application"). (R. 280). In this application, P&Z applied for an aggregate award of $124,803.07 for services rendered from May 2, 2011, to July 30, 2012. (*Id.*). Specifically, P&Z requested $123,018.00 for 316.3 hours of professional services at a blended hourly rate of $388.93, as well as $1,785.07 for expenses. (*Id.*).

On July 12, 2013, the U.S. Trustee filed objections to the Fee Application, arguing, with specific reference to billing record entries, that P&Z had (i) used "lumped" time entries, (ii) inefficiently assigned staff to certain tasks, and (iii) used vague time entries. (R. 293 at 9-12). After negotiations with the U.S. Trustee's Office, P&Z agreed to reduce its fees voluntarily by $2,412.00, the amount objected to by the Trustee. (R. 311 at ¶ 21; *see also* Hr'g Tr. 13). In calculating P&Z's final award, it appears that the Bankruptcy Court did not account for this agreed-to reduction because the Court reduced P&Z's initial fee request of $123,018 by 40 percent. (R. 327).

Separately, on July 15, 2013, GMDC filed an objection to the Fee Application, arguing that it should be denied in its entirety because P&Z had (i) breached its fiduciary duties; (ii) caused delays; (iii) engaged in activities designed solely to generate legal fees; and (iv) purposely prevented GMDC from

---

Bankruptcy Court and the U.S. Trustee representative believed that Pick had appeared in court at least once subsequent to the Chapter 11 trustee's appointment. (*Id.* at 57).

obtaining a reasonable settlement of its claim.  (R. 297 at ¶ 2; *see also* R. 298 at 1-17).  In addition to the conflict issue described above, GMDC also claimed that P&Z's fees could be denied in their entirety because of arguable impropriety during the representation, including claims that P&Z (i) drafted one-sided bylaws, refused to consider GMDC's suggestions, and never circulated the final bylaws; (ii) retained an accounting firm with which it had a prior relationship, without allowing GMDC to interview the accountants first; (iii) ignored GMDC's requests for a substantive financial analysis or a forensic accounting of the Debtors' records; (iv) retained only one broker, whom GMDC was not permitted to interview, to sell the Debtors' business; (v) proposed a plan that impermissibly focused on unsecured creditors other than GMDC; and (vi) "all but excluded [GMDC] from all Committee deliberations."  (R. 298 at 13-17).  As a fallback position, GMDC argued that the fees sought in P&Z's application should be substantially reduced because of these issues and other "objectionable" billing entries that were detailed in the remainder of the submission.  (*Id.* at 19-29).

P&Z responded to all of these claims in a reply submission filed with the Bankruptcy Court on July 19, 2013.  (R. 311).[15]

### 8.   The Confirmation Hearing

By Order entered January 22, 2013, the Bankruptcy Court had authorized the Chapter 11 Trustee to administer a sale of the Debtors'

---

[15]    GMDC also filed objections to several of the other fee applications filed by professionals who had provided services during the bankruptcy.  (*See* R. 299-302).  These professionals filed reply submissions addressing GMDC's objections.  (*See* R. 308-310).

business to Ernest Klein 6th Avenue Foods, Inc. (R. 293 at 4; R. 278 at ¶ 10).

The plan was subsequently amended in May 2013. (Hr'g Tr. 5). At the

Confirmation Hearing on July 22, 2013, Judge Glenn confirmed the Chapter

11 Trustee's first amended plan of liquidation and resolved several outstanding

fee applications. In attendance at the Confirmation Hearing were Pick, Brown,

Rosen, and other parties representing the professionals requesting final

compensation. (Hr'g Tr. 2-3).

### a.    The Complaints About P&Z's Representation

After addressing certain issues relating to plan confirmation, the

Bankruptcy Court addressed the fee applications at length. At the outset,

counsel for the Chapter 11 Trustee noted two sets of objections to the fee

applications, one from the U.S. Trustee and one from GMDC. (Hr'g Tr. 13).

After listening to counsel for the Chapter 11 Trustee outline the voluntary

reductions to which the professionals had agreed, the Bankruptcy Court posed

specific questions to the representative from the U.S. Trustee. Among other

things, the Court inquired as to the U.S. Trustee's analysis of the fee

applications and of GMDC's objections to those applications:

> My question ... is obviously Mr. Brown has filed objections to
> virtually everybody's fees on grounds that include some of the same
> grounds in which the U.S. Trustee objected, but many others. And
> my question to you is whether the U.S. Trustee has had an
> opportunity to consider Mr. Brown's objections and take them into
> account in any adjustment of the fees that you've negotiated.

(*Id.* at 14; *see also id.* at 15 (The Court: "Mr. Brown's objection went beyond the

U.S. Trustee's objection with respect to the amounts of fees incurred by various

parties by the Committee and others. And would I be correct in assuming that

you considered all of the arguments that Mr. Brown made in [terms] of your own negotiation with the various professionals in your proposed resolution?")). The U.S. Trustee representative confirmed to the Bankruptcy Court that his office had reviewed GMDC's arguments concerning purported conflicts but "did not pursue an objection on those grounds," and, further, that he believed GMDC's other arguments had been considered by the member of his office who had negotiated the voluntary fee reductions. (*Id.* at 14-15).

When GMDC's attorney Rosen noted that the absence of U.S. Trustee support did not "set[ ] a barrier" to the Bankruptcy Court's consideration of all of GMDC's objections, the Court did not disagree, but noted:

> I'm not suggesting it sets a barrier, but the U.S. Trustee, I have great respect for what they do.  In reviewing professional fee applications, they['re] very diligent, and they're very mindful of disclosure issues in particular.  But also in reviewing the details of applications and where appropriate negotiating adjustments.  That doesn't preclude — I have an independent obligation to review fee applications, and I take that role seriously.

(Hr'g Tr. 18).  After confirming that he had read the parties' submissions (*id.* at 36, 41), Judge Glenn proceeded to review with both counsel for GMDC, Brown and Rosen, GMDC's challenges to the fee applications of various professionals, including P&Z (*id.* at 34-46).

As to several of GMDC's broader complaints about P&Z's representation of the Creditors' Committee — and without minimizing or discrediting these complaints — Judge Glenn expressed dismay that he had not been advised earlier:

> If your objection was that the selection of the professionals was done improperly because a committee member — [the] committee member

> with the largest claim — wasn't permitted to participate or have its
> views expressed, do you think maybe the time to have asserted your
> objection was when I was being asked to approve a retention, rather
> than at the end[?]

(Hr'g Tr. 20; *see also id.* at 24 ("So I'm not saying you waived your argument,
but it is hardly persuasive when you stand here now objecting to fee
applications on grounds that could have been raised with the Court a long time
ago."); *id.* at 63 ("[L]ook, nobody likes to raise these issues early in the case, to
try and work them out, but what I don't like is to hear about it at the 11-3/4
hour of the proceedings.")).

With respect to the particular issue of Creditors' Committee meetings
and notice of those meetings, the Bankruptcy Court observed similarly:

> Mr. Brown, if you had — before Mr. Rosen got involved in this case,
> if at one of the many hearings in this case, and there were numerous
> hearings, if you had raise[d ]on the record with me that your client,
> a member of the committee has not been invited to, included in, the
> committee meetings, I would have dealt with the issue.  I don't know
> what the resolution would have been, but ... I take those kinds of
> arguments seriously.

(Hr'g Tr. 46).  That said, the Court specifically asked Pick how many telephonic
and in-person meetings of the Creditors' Committee had been held.  (*Id.* at 48).
Pick recalled two sit-down meetings and "[l]ess than five, maybe six" telephonic
meetings; although he could not recall with certainty, he did not believe that
there were many meetings.  (*Id.* at 49).  Pick indicated that most items were
accomplished by email.  (*Id.*).

After listening to counsel for P&Z and GMDC, the Bankruptcy Court then
proceeded to outline its concerns:

20

> The main point I wanted to — I am concerned about this issue — what your committee counsel, [GMDC], as a member of the committee, whether Mr. Rosen and Mr. Brown characterized it as being excluded from deliberations of the committee....   I want to know whether they were given notice of meetings and whether they participated in telephone or face-to-face meetings.

(Hr'g Tr. 59; *see also id.* at 61 ("It clearly would be improper for counsel to the committee to exclude a committee [member].  And by excluding, I'm including giv[ing] them notice of meetings, telephonic or face to face.")).

For all professionals other than P&Z, the Bankruptcy Court approved the fee applications with the voluntary reductions negotiated by the U.S. Trustee, specifically overruling GMDC's objections to those applications.  (Hr'g Tr. 61). For P&Z, however, the Bankruptcy Court took the application under submission, and requested supplemental declarations from Pick and Brown as to the number of face-to-face and telephonic Creditors' Committee meetings; whether GMDC was given notice of the meetings; and whether GMDC attended the meetings.  (*Id.* at 52).  The Court noted that of all of the objections raised by GMDC, both substantive and billing-related, "the issue that I remain focused on" concerned GMDC's exclusion *vel non* from Committee meetings.  (*Id.* at 61; *see also id.* at 63 ("Mr. Pick, I expect to rule promptly on your fee application, and I've indicated the one issue as to which I'm troubled[.]")).  The Court informed the parties that after receiving the declarations, it would decide whether to hold another hearing or simply enter an order based on the supplemented record.  (*Id.* at 61).

21

### b. The Complaints About P&Z's Potential Conflicts

Separately, the Bankruptcy Court addressed several conflict-of-interest claims mounted by GMDC. As a preliminary matter, the Court was skeptical of P&Z's argument that its representation of the Creditors' Committee had terminated upon appointment of the Chapter 11 Trustee. (*See* Hr'g Tr. 55-57). That said, the Court opined that

> in fairness to Pick & Zabicki, even assuming there was an obligation to update, I don't get too excited about it frankly. It's sort of in the no-harm/no-foul category. I don't [underestimate] the importance of it. I don't want to diminish the importance of the disclosure obligation under [Federal Rule of Bankruptcy Procedure] 2014.

(*Id.* at 58-59). The Bankruptcy Court confirmed that P&Z sought no fees for the post-trustee period. (*Id.* at 59; *see also* R. 280, Ex. B at 59). Further, the Court understood that any nondisclosure issues had been considered by the U.S. Trustee when it reviewed the fee application and negotiated with P&Z to lower its fees by $2,412. (Hr'g Tr. 14-15, 18).

Ultimately, the Bankruptcy Court found that although subsequent representations "should be timely disclosed," it was unaware of "any authority that would prohibit or preclude a committee's counsel from representing creditors, or in this case, a representative of a creditor, in other matters" (Hr'g Tr. 30), and, as such, that "there's nothing that [the Court knew] of in the law that would preclude [this situation] from happening" (*id.* at 31). Moreover, the Court observed, GMDC and its counsel had neither raised the nondisclosure argument to the Court prior to the Confirmation Hearing nor moved to disqualify Pick as counsel. (*Id.* at 31-32).

9.     **The Post-Hearing Declarations**

Responding to Judge Glenn's directives at the Confirmation Hearing, in a declaration dated July 25, 2013, Pick related that "not less than two (2) in-person Committee meetings were formally scheduled and held." (R. 322 at ¶ 2). The first was "on or about April 14, 2011," and the second was on May 2, 2011. (*Id.* at ¶¶ 2-3). Pick, however, only attended the first one. (*Id.*). It was during the second meeting that P&Z was retained as counsel. (*Id.* at ¶ 3). Pick noted that two other meetings between the Committee and a potential seller occurred on April 19, 2012, and May 8, 2012, and that Rosen was present at both. (*Id.* at ¶¶ 5-6). Pick also indicated that despite efforts to schedule telephonic meetings, none had occurred. (*Id.* at ¶ 7).[16]

Two affidavits were submitted on behalf of GMDC. Brown submitted an affidavit dated July 29, 2013. (R. 326). In it, he attested that two Creditors' Committee meetings had occurred before P&Z was retained: one on April 4, 2011, and the other on May 2, 2011. (*Id.* at ¶ 3). He stated that GMDC did receive prior notice for these meetings. (*Id.*). Brown further declared that after P&Z was retained on or about May 3, 2011, no other Creditors' Committee meetings were held for which GMDC received notice or at which GMDC was present. (*Id.*).

Rosen also submitted a declaration dated July 29, 2013, in which he declared that he had never been to any Committee meetings, but acknowledged

---

[16]     Morrison (counsel for Okey) and Choi (counsel for NYCC) submitted declarations supporting Pick's assertions. (R. 323-324).

that there were meetings with proposed purchasers (presumably the ones that Pick said had occurred on April 14 and May 2, 2011).  Rosen further declared that the meetings with the proposed purchasers were not Creditors' Committee meetings.  (R. 325 at ¶ 4).

### 10.   The Bankruptcy Court's Decision

On August 29, 2013, Judge Glenn issued the Fee Order, reducing the initial (*i.e.*, pre-voluntary reduction) fees sought by P&Z's by 40 percent, or $49,207.20.  (R. 327).  In so doing, the Bankruptcy Court considered the work that had been done on behalf of the Creditors' Committee, the bills submitted for that work, and the degree to which all of the Committee members' interests had been solicited and taken into account.  The Court based its decision to reduce the fee on the fact that since the case had been filed, several pleadings had been filed by P&Z on behalf of the Creditors' Committee, including motions to lift a stay and for substantial consolidation of the two cases, as well as the filing of three periodic status reports.  (*Id.*).  The Court found it "improper" that, given the existence of those filings and other "important developments in the case," "P&Z never convened an in-person or telephonic Creditors' Committee meeting in [the] case, with advance notice to GMDC and Brown."  (*Id.*).  The Bankruptcy Court further explained that P&Z's "failure" to hold such meetings and provide notice "raise[d] serious questions about P&Z's representation of the Creditors' Committee."  (*Id.*).  For those reasons, the award was reduced from $124,803.07 to $75,595.87 — comprising $73,810.80 for professional services and $1,785.07 for expenses.  (*Id.*).

**B.     The Instant Litigation**

On August 30, 2013, P&Z filed its notice of appeal of the Fee Order in this District.  (Dkt. #1).  On September 12, 2013, GMDC filed a notice of cross-appeal.  (Dkt. #3).  On November 12, 2013, P&Z filed its opening brief.  (Dkt. #5).  The Court issued a Bankruptcy Appeal Scheduling Order on November 13, 2013, instructing the parties to comply with Rule 8006 of the Federal Rules of Bankruptcy Procedure with respect to designating the items to be included in the record on appeal and the submission of appeal briefs.  (Dkt. #7).

On November 19, 2013, the United States Trustee submitted a brief as *amicus curiae* supporting neither party.  (Dkt. #8).  GMDC submitted its combined brief in opposition and cross-appeal on November 26, 2013.  (Dkt. #11).  P&Z filed its combined reply and opposition brief on December 10, 2013 (Dkt. #13), and on December 24, 2013, the appeal was fully submitted when GMDC submitted its reply brief (Dkt. #15).

**DISCUSSION**

**A.     Applicable Law**

**1.  The Standard of Review for Bankruptcy Court Decisions**

Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.  A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

25

In general a district court reviews a "Bankruptcy Court's findings of fact for clear error [and] its conclusions of law de novo." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000); *see also In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012) ("Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo."), *cert. denied*, 133 S. Ct. 2021 (2013). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge credibility of the witnesses." Fed R. Bankr. P. 8013; *see also In re Lafayette Hotel P'ship*, 227 B.R. 445, 448 (S.D.N.Y. 1998). "[A] finding is 'clearly erroneous' when" the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

A bankruptcy court's decision to award attorney's fees is reviewed for abuse of discretion. *See In re Bayshore Wire Prods. Corp.*, 209 F.3d at 103 ("Like the District Court, we review the Bankruptcy Court's ... decision to award costs, attorney's fees, and damages for abuse of discretion."); *In re Emanuel*, 460 F. App'x 48, 50 (2d Cir. 2012) (summary order) ("We review the bankruptcy court's denial of attorney's fees for abuse of discretion ...."); *In re JLM, Inc.*, 210 B.R. 19, 23 (2d Cir. 1997) ("Bankruptcy courts enjoy wide discretion in determining reasonable fee awards, which discretion will not be disturbed by an appellate court absent a showing that it was abused."). In

26

consequence, a reviewing court should not interfere with a bankruptcy court's decision absent a clear abuse of discretion.  *See In re Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 943 (2d Cir. 1979); *Howard* v. *High River Ltd. P'ship*, 369 B.R. 111, 114 (S.D.N.Y. 2007) ("A bankruptcy court's decision with regard to compensation for services performed during bankruptcy proceedings deserves great deference.").

As the Second Circuit has held, "[a] bankruptcy court exceeds its allowable discretion where its decision [i] rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or [ii] cannot be found within the range of permissible decisions, even if it not necessarily the product of a legal error or a clearly erroneous factual finding." *Schwartz* v. *Geltzer (In re Smith)*, 507 F.3d 64, 73 (2d Cir. 2007) (internal quotation marks and citation omitted); *accord Johnson* v. *Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011).

### 2. Awarding Professional Fees and Expenses in Bankruptcy Proceedings

Pursuant to Section 330 of the Bankruptcy Code, a bankruptcy court may award fees to professionals, including attorneys.[17]  Section 330 provides in relevant part:

---

[17]     GMDC relies on Sections 503(b)(3) and (4) of the Bankruptcy Code to support its argument that the Bankruptcy Court erred in awarding P&Z any fees.  (GMDC Opp. 23).  This provision "authorizes the bankruptcy court to award compensation to creditors for their legal and other expenses incurred in making a substantial contribution to the case."  *In re Dana Corp.*, 390 B.R. 100, 107 (S.D.N.Y. 2008) (citing 11 U.S.C. § 503(b)).  Section 503 is, however, inapplicable where the court is presented with "ordinary fee applications by court-authorized counsel" to which Section 330 applies.  *In re Granite Partners*, 213 B.R. 440, 447 (S.D.N.Y. 1997).  Indeed, "an award under Section 330 is the general rule, [whereas] a substantial contribution award [under section 503] is the

> After notice to the parties in interest and the United States Trustee and a hearing ... the court may award ...
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
>
> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).  Section 330 provides the court with authority to "award compensation that is less than the amount of compensation that is requested." *Id.* § 330(a)(2); *see also In re DeGroof*, No. 07 Civ. 525 (RRM), 2008 WL 4560088, at *2 (E.D.N.Y. Sept. 29, 2008) ("[Section 330] also allows the court to *sua sponte* award compensation that is less than the amount of compensation that is requested." (internal quotation marks omitted)).

To determine the "reasonable compensation to be awarded to a[ ]... professional person," the court must "consider the nature, the extent, and the value of such services, taking into account all relevant factors," including, but not limited to,

> [i] the time spent on such services; [ii] the rates charged for such services; [iii] whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; [iv] whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; [v] with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and [vi] whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

---

exception." *Id.* Here, the Bankruptcy Court authorized P&Z's retention pursuant to Section 330 (R. 64), and P&Z applied for fees under that section (R. 280).

11 U.S.C. § 303(a)(3).  In so doing, the court necessarily considers the quality of the services rendered.  *See Grausz* v. *Englander*, 321 F.3d 467, 473 (4th Cir. 2003) ("The fee application proceeding necessarily included an inquiry by the bankruptcy court into the quality of professional services rendered [by the law firm].");  *In re Iannochino*, 242 F.3d 36, 47 (1st Cir. 2001) ("A bankruptcy court therefore makes an implied 'finding of quality and value' in the professional services provided to the [the debtors] during the bankruptcy." (quoting *In re Intelogic Trace, Inc.*, 200 F.3d 382, 387 (5th Cir. 2000));  *cf. In re Penn-Dixie Indus.*, 18 B.R. 834, 838-39 (Bankr. S.D.N.Y. 1982) (recognizing the "quality of advocacy required and delivered" as a relevant criteria for determining appropriate attorneys' fees).  Moreover, a court may reduce the requested compensation "if the court finds that the work done was excessive or of poor quality."  *In re Bronx 439 E. 135th St. D.T. Bldg. Corp.*, No. 11 Civ. 15855 (MG), 2014 WL 200996, at *5 (Bankr. S.D.N.Y. Jan. 17, 2014) (quoting 3 COLLIER ON BANKRUPTCY ¶ 329.04).

## B.   Analysis

### 1.  The Parties' Positions

P&Z argues that the Bankruptcy Court erred as a matter of law and of fact in reducing its fee by 40 percent based on the Court's finding that the P&Z "never convened an in-person or telephonic Creditors' Committee meeting in this case, with advance notice to [GMDC] and [Mr.] Brown."  (P&Z Br. 1).  P&Z sets forth five arguments in support of its position:

- First, P&Z contends that under Section 1103 of the Bankruptcy Code, the Creditors' Committee was not required to convene more

than one meeting and, more generally, was not required to conduct Committee business at meetings. (*Id.* at 10-11).

· Second, and relatedly, P&Z maintains that it was not required by statute or bylaws to convene any Creditors' Committee meetings, and that the Bankruptcy Court "completely ignore[d] the emails and statements" that P&Z submitted to show their attempts to convene meetings. (*Id.* at 12-14).

· Third, P&Z argues that under Section 330(a) of the Bankruptcy Code, it should have been awarded reasonable fees as calculated by the lodestar method, and that a 40 percent reduction was arbitrary and improper. (*Id.* at 14-16).

· Fourth, P&Z claims that the Bankruptcy Court improperly used hindsight to justify its reduction of the fee awards. (*Id.* at 16-18).

· Fifth and finally, P&Z asserts that the Bankruptcy Courts' decision to reduce its fee was improperly based on a review of the quality of P&Z's performance. (*Id.* at 19-20).

GMDC takes the opposite position, arguing that the Bankruptcy Court did not abuse its discretion in reducing P&Z's fee. (GMDC Opp. 10). More particularly, GMDC claims that Pick

repeatedly breached [his] fiduciary duties as counsel to Creditors' Committee in the below bankruptcy proceedings, [and] also caused unnecessary and undue delay, engaged in meaningless activities that brought virtually no benefit whatsoever to the Debtors' estate and only served to generate substantial legal fees, failed to adequately represent all of the creditors and their interests, and was deliberately antagonistic in his efforts to prevent the largest unsecured creditor in this action, GMDC, from obtaining a reasonable settlement of its claim.

(*Id.* at 3).

In some tension with this argument, GMDC goes on to assert in its cross-appeal that the Bankruptcy Court erred as a matter of fact and/or law in reducing the fee only by 40 percent, and not denying P&Z the full compensation sought in its fee application. (GMDC Opp. 12). As to this latter

argument, GMDC contends that the Bankruptcy Court should have denied P&Z any compensation because P&Z (i) breached its fiduciary duties and (ii) failed adequately to disclose a conflict of interest between P&Z and counsel for a member of the Committee (*viz.*, Morrison, who represented Okey).  (*Id.* at 12-13).  In the alternative, GMDC argues that the Bankruptcy Court should have considered the conflicts inherent in P&Z's representation, as well as the various challenges to P&Z's fee application based on its billing records, in reducing the award even more than the 40 percent reduction imposed.  (*Id.* at 25).

The parties' arguments in favor of their respective appeals, and in opposition to their adversaries' appeals, are duplicative and overlapping.  For that reason, their appeals will be considered together.  As set forth below, neither side's arguments establish that the Bankruptcy Court abused its discretion.  Rather, the record makes clear that the Bankruptcy Court did not rest its decision on an error of law or on a clearly erroneous factual finding (other than the arithmetic error discussed above), and that its decision was within the range of permissible decisions.

### 2. P&Z Has Not Identified an Error of Law or a Clearly Erroneous Factual Finding

#### a.      Section 1103 Does Not Require that a Certain Number of Creditors' Committee Meetings Be Held

P&Z contends first that Section 1103(a) of the Bankruptcy Code "expressly sets forth the number of meetings that a creditors' committee must

have: one." (P&Z Br. 11).  Section 1103(a) contains no such directive.  Instead, it provides:

> At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

11 U.S.C. § 1103(a).  By its terms, therefore, this section does not prescribe a number of meetings that must be held, but rather describes what "may" take place at a meeting where a "majority of the members of such committee are present," which includes selecting and authorizing an attorney to perform services for the committee.  *Id.*  The language is purely permissive, and neither requires any meetings nor limits their number.

Proceeding from this (now discredited) argument, P&Z contends further that it satisfied Section 1103(a)'s directive of one meeting through the two Creditors' Committee meetings that were held before P&Z was retained.  (P&Z Br. 11 ("More than the required number of meetings were held, and the Creditors' Committee fully fulfilled its statutory duty.")).[18]  Not only is this argument legally erroneous for the reasons just stated, but it is also factually irrelevant: The actions taken prior to P&Z's retention surely cannot support its entitlement to the attorneys' fees requested.  What is more, actions taken by the Creditors' Committee before P&Z was counsel cannot absolve the firm of its

---

[18]     P&Z also argues that the Creditors' Committee bylaws did not require that they convene any Committee meetings.  (P&Z Br. 12-14).  This argument borders on the absurd, inasmuch as Pick could not even confirm the existence of Committee bylaws.  (*See* Hr'g Tr. 49-50).

duty to represent properly the Creditors' Committee's interests during the course of its representation.

Both parties agreed in their declarations to the Bankruptcy Court that no in-person or telephonic meetings of the Committee had occurred after P&Z was hired.  (*See* R. 322-326).  The record is equally clear that GMDC complained repeatedly to P&Z that they were being excluded from participating in the Committee.  (*See, e.g.*, R. 311, Ex. A at 6 ("Your desire to have meetings by telephone is simply part and parcel of your agenda to continue to exclude my client from any meaningful participation on the Creditors' Committee.")).

P&Z's arguments in this regard misperceive the crux of the Bankruptcy Court's decision.  Judge Glenn did not find that lawyers representing a creditors' committee are required under the Bankruptcy Code to convene a particular number of meetings.  Rather, he found that, having filed pleadings on the Committee's behalf, and having considered and advised the Committee on the legal ramifications of several "important developments in the case" — and now seeking a considerable amount of money for these services — P&Z had been obligated, at some point during its representation of the Creditors' Committee, to convene a meeting of the whole Committee, with notice to each of its constituent members.  (R. 327).  By failing to hold any meetings at which all members of the Committee were present, P&Z hindered the parties from having a meaningful conversation about the issues important to Committee members.  Perhaps more importantly, the refusal to schedule meetings with notice to all parties, given the history of antagonism between and among

33

Committee members and P&Z, caused the Bankruptcy Court to have deeper concerns about the quality of P&Z's representation of the Committee. These are the pertinent facts on which the Bankruptcy Court properly focused, and they supports its decision to reduce P&Z's fee.

### b. The Fee Awarded Was Reasonable and Not Arbitrary

As stated previously, Section 330 of the Bankruptcy Code authorizes a bankruptcy court to award reasonable compensation to a fee applicant based on "actual, necessary" services rendered by an attorney. 11 U.S.C. § 330(a)(1). To determine what fee is reasonable, a bankruptcy court considers "the nature, the extent, and the value of such services," including a list of non-exhaustive factors. *Id.* § 330(a)(3). P&Z bears the burden of proof on its claim for attorneys' fees. *In re Quigley*, 500 B.R. 347, 356 (S.D.N.Y. 2013).

In tandem with a court's review of these factors, "there is '[a] strong presumption that the lodestar figure — the product of reasonable hours times a reasonable rate — represents a reasonable fee.'" *In re Quigley*, 500 B.R. at 356 (alteration in original) (quoting *Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)); *see also In re W. End Fin. Advisors, LLC*, No. 11 Civ. 11152 (SMB), 2012 WL 2590613, at *4 (Bankr. S.D.N.Y. July 3, 2012) ("The rules that govern fee awards and time record keeping in bankruptcy mirror those that apply in non-bankruptcy cases. Courts outside of bankruptcy generally apply the 'lodestar' method under which they arrive at a fee 'by multiplying the number of hours reasonably expended on the litigation ... by a reasonable hourly rate.'" (alteration in original) (quoting *Kirsch*

v. *Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998)) (internal quotation marks omitted)); *In re Brous*, 370 B.R. 563, 565 (Bankr. S.D.N.Y. 2007) ("[P]rofessionals[ ] must generally establish [their] right to compensation under the 'lodestar' method incorporated into 11 U.S.C. § 330.").

P&Z advances two arguments as to why the Bankruptcy Court incorrectly applied the lodestar method. Neither succeeds. First, P&Z contends that the Bankruptcy Court's decision did not result in a "reasonable" fee as required under the lodestar method (P&Z Br. 15-16); second, P&Z argues that it was improper for the Bankruptcy Court to reduce P&Z's fee based on the quality of its work under a lodestar analysis (*id.* at 19).

Regardless of whether the Bankruptcy Court applied the lodestar figure, the result achieved here would be "reasonable." The bases for P&Z's argument that the fee awarded was not reasonable are (i) that P&Z need not have convened any meetings, and (ii) that the Bankruptcy Court never made any findings that the legal services provided by P&Z were not beneficial to the relevant parties, that any of P&Z's work was objectionable on the merits, or that the compensation requested by P&Z did not otherwise satisfy the criteria set forth under Section 330(a). (P&Z Br. 15). These arguments, however, fail on the law and on the facts.

To start, as this Court has already held, the Bankruptcy Code did not relieve P&Z of the need to convene Committee meetings, with appropriate notice to all, when and as appropriate. The Bankruptcy Court's attention to the lack of meetings was entirely appropriate, particularly in the face of

35

assertions by GMDC that it had been excluded from participating in the Creditors' Committee and, consequently, that its interests were not being adequately represented.  (R. 311, Ex. A at 6; Hr'g Tr. 18, 61).

The Bankruptcy Court's decision vitiates P&Z's remaining arguments. The Court noted that several pleadings had been filed and "important developments" had occurred in the case without any meetings of the Creditors' Committee.  (R. 327).  Those facts led the Bankruptcy Court to conclude that it was improper for P&Z never to have convened an in-person or telephonic Creditors' Committee meeting without advance notice to GMDC or Brown.  (*Id.*). The Bankruptcy Court further found that P&Z's failure to convene the meetings as stated "raise[d] serious questions about P&Z's representation of the Creditors' Committee."  (*Id.*).  Implicit in, and critical to, the Bankruptcy Court's decision are findings that the legal services provided by P&Z were *not* entirely beneficial to the relevant parties, and that the firm's efforts (or, more pointedly, the lack thereof) were objectionable on the merits and did not fully meet Section 330(a)'s criteria.

Even if the Bankruptcy Court decision did not support these conclusions, which of course it does, the fee awarded would nonetheless be reasonable. There is no requirement that the Bankruptcy Court employ the particular framework advanced by P&Z.  Rather, "[b]ankruptcy courts enjoy wide discretion in determining reasonable fee awards, which discretion will not be disturbed by an appellate court absent a showing that it was abused." *In re JLM, Inc.*, 210 B.R. at 23 (*citing Dickinson Indus. Site* v. *Cowan,* 309 U.S. 382,

389 (1940)); *see also In re Cenargo Int'l, PLC*, 294 B.R. 571, 598 (Bankr.
S.D.N.Y. 2003) ("Bankruptcy courts enjoy wide discretion in determining
reasonable fee awards.").  This discretion was not abused: Judge Glenn
presided over the case from its inception, evaluating counsel's performance and
contributions throughout the course of the proceedings.  *See Bernheim* v.
*Damon and Morey, LLP*, Nos. 06-3386-bk (L), 06-3389-bk (CON), 2007 WL
1858292, at *2 (2d Cir. June 28, 2007) (summary order) (holding "that the
Bankruptcy Court did not abuse its discretion in approving as reasonable
D&M's final fee application" because the judge had presided over the
bankruptcy for its duration and "had the opportunity to evaluate first-hand
both the quality of D&M's performance and the contributions made by the
firm"); *cf.* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or
documentary evidence, shall not be set aside unless clearly erroneous, and due
regard shall be given to the opportunity of the bankruptcy court to judge
credibility of the witnesses.").

     Turning to P&Z's second argument, Section 330's instruction that the
court "consider the nature, the extent, and the value" of the professional
services rendered when taking into account the non-exhaustive list of relevant
factors did not foreclose the Bankruptcy Court from also considering the
quality of P&Z's work in reducing its overall fee award.  In support of its
argument that qualitative factors cannot be the basis for adjusting a lodestar
figure, P&Z relies on *Pennsylvania* v. *Delaware Valley Citizens' Council*, 478
U.S. 546 (1986).  Notably, however, P&Z omits the Court's reasoning when

citing its observation that "[t]he overall quality of [counsel's] performance should not be used to adjust the lodestar ...." *Id.* at 565.  That reasoning is significant:

> Because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance *ordinarily* should not be used to adjust the lodestar, thus removing any danger of "double counting."

*Id.* at 566 (emphasis added).  Thus, the Supreme Court was confronted with a factual circumstance where a requested fee increase was based on the ostensibly superior quality of representation, and it thereby limited its observation to cases where there is a risk of double-paying (or double-discounting) fees.  *Id.*  There is no similar concern here, as there is no evidence that the bankruptcy court double-counted, or any indication that P&Z shared the bankruptcy court's dim view of the quality of its work when setting its initial hourly rate.

In other words, *Delaware Valley Citizens' Council* demonstrates that qualitative concerns are not irrelevant, but where the quality of work is already considered in determining the reasonable hourly rate under a lodestar method, it need not be considered a second time when a party requests that its fee be increased.  As made clear in the amicus brief filed by the U.S. Trustee (*see* U.S. Trustee Br. 4-7), and contrary to P&Z's position in this appeal, a court may reduce a fee determined under the loadstar method where qualitative factors require doing so.  *See, e.g.*, *In re Trailer Source, Inc.*, 474 B.R. 846, 851 (M.D. Tenn. 2012) ("The lodestar amount may then be adjusted upward or downward

based on other qualitative factors."); *In re Ohio Indus., Inc.*, 299 B.R. 853, 858 (Bankr. N.D. Ohio 2003) ("The lodestar standard is an objective starting point, but the inquiry does not end there.  Qualitative factors may be placed into the equation." (internal citation omitted)); *Harman* v. *Levin*, 772 F.2d 1150, 1153-54 (4th Cir. 1985) (upholding a bankruptcy court's 40 percent reduction in fee request).  It is both mathematically and legally irrelevant whether the bankruptcy court reduced the hourly rate by 40 percent before multiplying by the full time, reduced the time by 40 percent before multiplying by the full hourly rate, or multiplied the full rate by the full time and then reduced the overall fee award by 40 percent for quality.

Section 330 necessarily provides bankruptcy courts with the discretion to consider the "quality and value in the professional services provided."  *In re Iannochino*, 242 F.3d at 47 ("A bankruptcy court therefore makes an implied 'finding of quality and value' in the professional services provided to the Iannochinos during the bankruptcy." (quoting *In re Intelogic Trace, Inc.*, 200 F.3d at 387)); *see also Grausz*, 321 F.3d at 473 ("The fee application proceeding necessarily included an inquiry by the bankruptcy court into the quality of professional services rendered [because the] court was required to 'consider the nature, the extent, and the value of such services' before awarding fees." (quoting 11 U.S.C. § 330(a)(3))); *In re Penn-Dixie Indus.*, 18 B.R. at 838-39 (finding "quality of advocacy required and delivered" to be a relevant criteria for determining award of attorneys' fees).  In point of fact, the clear statutory language instructs the bankruptcy court to consider "all relevant factors,

*including*" those listed, in determining the "value" of the services rendered, 11 U.S.C. § 330(a)(3) (emphasis added), and does not limit the court to the factors identified in that section, *see* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting").

In sum, there is nothing in the record to suggest that the fee awarded by the Bankruptcy Court was not entirely reasonable.   This is particularly true given the wide range of factors that it was permitted to consider even when assessing a lodestar figure and the wide discretion afforded to bankruptcy courts in the award of attorneys' fees.

### c.     The Bankruptcy Court's Decision Was Not Based on Hindsight

Relatedly, P&Z argues that the Bankruptcy Court erred by using "hindsight to determine the reduction of P&Z's compensation." (P&Z Br. 16). In support, P&Z points to statements that Judge Glenn made during the Confirmation Hearing regarding GMDC's earlier failure to raise its purported exclusion from Creditors' Committee meetings, as well as his questioning concerning the number of Creditors' Committee meetings held. (*Id.* at 16-18). Again, P&Z's argument is belied by the record.

To be sure, when determining the amount of reasonable compensation to be awarded under Section 330, a bankruptcy court may "not determine 'reasonableness' through hindsight" because a "decision reasonable at first may turn out wrong in the end."  *In re Brous*, 370 B.R. at 570 (internal citation omitted).  Instead, "[t]he test is an objective one, and considers 'what services a reasonable lawyer or legal firm would have performed in the same

40

circumstances.'" *Id.* (quoting *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996), *abrogated on other grounds by Lamie* v. *U.S. Trustee*, 540 U.S. 526 (2004)); *accord In re Nw. Airlines Corp.*, 382 B.R. 632, 648 (Bankr. S.D.N.Y. 2008). Under this standard, "[t]he focus is on what a reasonable lawyer would have done at the time." *In re Cenargo Int'l, PLC*, 294 B.R. at 595. In contrast, a hindsight analysis is used for fee applications brought under Section 503 of the Bankruptcy Code. *In re Granite Partners*, 213 B.R. at 447. In those cases, a court determining the reasonableness of a fee "scrutinizes the actual benefit to the case," and requires the applicant to show "a causal connection between the services and the contribution." *Id.* (internal quotation marks omitted).

Judge Glenn's statements do not evince a hindsight analysis. Indeed, the hearing record is silent on whether P&Z's failure to convene Creditors' Committee meetings benefitted the case or whether there was a causal connection between the absence of such meetings and any resulting contribution. This is far from surprising, considering the present circumstances; it would be farfetched for a fee applicant to contend that the failure to conduct standard meetings that would presumably facilitate the interests of the creditors somehow positively benefited the bankruptcy proceeding. Instead, P&Z's citations to the Confirmation Hearing are more accurately read as the Bankruptcy Court chastising GMDC for not having raised certain issues earlier so that the Court could, if and as warranted, have remediated the matter at that time. In no way did the Court suggest that GMDC's claims lacked merit. To the contrary, the questioning by the

41

Bankruptcy Court at the Confirmation Hearing demonstrates its intention to obtain the necessary facts on which it could determine whether the services performed by P&Z accorded with what a reasonable legal firm would have performed in the same circumstances. That inquiry does not become hindsight simply by virtue of occurring at the end of the case, as P&Z suggests.

The Fee Order is further proof that the proper assessment was applied. After looking at the filings in the case after P&Z was retained, the Bankruptcy Court found that in light of such filings and the "important developments in the case," it was improper for P&Z never to have convened an in-person or telephonic Creditors' Committee meeting. (R. 327). This finding exhibits the Bankruptcy Court's focus on what P&Z should have done at the time when those filings were made and the case was developing. This was the proper assessment, and plainly was not based on hindsight.

### 3. GMDC Has Not Identified an Error of Law or a Clearly Erroneous Factual Finding

#### a. The Bankruptcy Court Properly Assessed the Purported Conflict Issues

In its cross-appeal, GMDC argues principally that the Bankruptcy Court erred in awarding P&Z any compensation. (GMDC Opp. 12). Specifically, GMDC argues that under Section 327(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, P&Z breached its fiduciary duty to the Creditors' Committee (and thus forfeited its right to compensation) by not disclosing that it represented Okey counsel Morrison in other, unrelated bankruptcy proceedings. (*Id.* at 13-16).

A review of the text of Section 327(a) confirms its inapplicability to the instant appeal:

> Except as otherwise provided in this section, *the trustee*, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added).  The text describes the mechanisms by which *trustees* may appoint counsel to a creditors' committee.  Here, however, the Creditors' Committee applied for authorization to retain P&Z, and such authorization was granted pursuant to Section 1103.  (R. 35, 64).[19]  Thus, P&Z's argument may only be predicated on Rule 2014.  *See* 9 COLLIER ON BANKRUPTCY ¶ 2014.01.[20]

"Rule 2014(a) requires a professional seeking an order for employment in a bankruptcy case to submit a verified statement setting forth the

---

[19]   It bears noting that while GMDC raised similar arguments in its submission to the Bankruptcy Court, it only mentioned Rule 2014 at the Confirmation Hearing.  (Hr'g Tr. 55).

[20]   This Court notes that Section 328 allows for denial of compensation due to conflict for persons hired under both Section 327 and Section 1103.  "Consequently, at least one case has held that, notwithstanding the language of § 1103, the disinterested and adverse interest requirements of [§] 327(a) also apply to the initial retention of counsel for a committee under § 1103."  *In re Enron Corp.*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *7 (S.D.N.Y. Feb. 3, 2003) (discussing *In re Caldor,* 193 B.R. 165, 170-71 (Bankr. S.D.N.Y. 1996)).

However, even if Section 327 applied, the Court's ultimate decision that P&Z acted in accordance with its disclosure requirements would stand, since the disclosure requirements in Rule 2014 are even more stringent than those in Section 327.  *See In re Leslie Fay Cos.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994) ("As I have explained, the requirements of Fed. R. Bankr. P. 2014 are more-encompassing than those governing the disinterestedness inquiry under section 327.").  And as the requirements of Section 327 are still more demanding than those of Section 1103, *see In re Enron Corp.*, 2003 WL 223455, at *7, it logically follows that the disclosure requirements under all of the arguably applicable statutory provisions are satisfied so long as Rule 2014's requirements are met.

professional's connections to the debtor, creditors, or any other party in interest, including their counsel and accountants." *In re Worldcom, Inc.*, 311 B.R. 151, 164 (S.D.N.Y. 2004). Rule 2014's purpose is "to provide the Court (and the United States Trustee) with information to determine whether the professional's retention is in the best interests of the estate, and to maintain the integrity of the bankruptcy system." *Id.* (internal citation omitted). In aid of this objective, Rule 2014 disclosures are to be "strictly construed." *In re Leslie Fay Cos.*, 175 B.R. at 533.

Proper disclosure enables the court to determine whether the retention should be approved. *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (S.D.N.Y. 1998). "The professional must disclose all facts that bear on its disinterestedness, and cannot usurp the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not." *Id.* (internal citation omitted). In that regard, "[t]he existence of an arguable conflict must be disclosed if only to be explained away." *Id.* "So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification." *In re Leslie Fay Cos.*, 175 B.R. at 533.

GMDC points to two actions in which P&Z represented Morrison, or in which P&Z was involved in bankruptcy matters in which Morrison also was involved, to argue that P&Z should be denied any compensation. (GMDC Opp. 20-21). As P&Z aptly points out, the Bankruptcy Court thoroughly assessed the disclosure issues that GMDC raises here, ultimately finding that

the record presented neither actual "conflict" nor a basis for disclosure.  While
respecting the importance of Rule 2014, Judge Glenn understandably saw "no-
harm/no-foul" where one of the challenged representations took place after the
appointment of the Chapter 11 Trustee, at a time where P&Z had stopped
advising (and was no longer billing) the Committee.  (Hr'g Tr. 58-59).  He
further recognized that any nondisclosure issues were taken into account when
the U.S. Trustee reviewed the fee application and negotiated with P&Z to lower
the fees by $2,412, noting that that the Trustee and its staff are "very mindful
of disclosure issues in particular."  (*Id.* at 14-15, 18).  Finally, even if there
were disclosure issues in this case, the Bankruptcy Court noted that it was
unaware of (and the parties could not identify) "any authority that would
prohibit or preclude a committee's counsel from representing creditors, or in
this case, a representative of a creditor, in other matters" (*id.* at 30), and that
"there's nothing that [the Court knew] of in the law that would preclude [this
situation] from happening" (*id.* at 31).[21]  GMDC similarly provides no basis here
on which this Court should question the Bankruptcy Court's determination.[22]

---

[21]     The absence of specific reference to the disclosure issue in the Fee Order does not
indicate that the Bankruptcy Court disregarded this issue.  To the contrary, the hearing
transcript evidences the close attention that the Court paid to this matter.  (*See* Hr'g Tr.
25-34).

[22]     This Court is disinclined to perform GMDC's work for it, but it is worth pointing out
that Section 1103's text makes clear that "[r]epresentation of one or more creditors of
the same class as represented by the committee shall not per se constitute the
representation of an adverse interest."  11 U.S.C. § 1103(b); *see also In re Enron Corp.*,
2003 WL 223455, at *7 ("Section 1103(b) is not violated if [a professional] represents an
entity with an adverse interest in a matter *unrelated* to the bankruptcy case or in a
matter that *pre-dates* [the professional's] representation of the Committee." (emphasis
in original)).

P&Z did disclose, albeit belatedly, its representation of Morrison in *Sol De Ibiza* in its Supplemental Disclosure Affidavit filed in the underlying bankruptcy proceeding.  (R. 94).  In that affidavit, P&Z attested to its and Morrison's involvement and affirmed that the other bankruptcy matter was "entirely unrelated" to the instant case.  (*Id.*).

As for *MMR Ventures*, the record does not present any facts from which a disclosure requirement can be discerned.  Nor does GMDC's argument that Morrison's and P&Z's "interests appear to be merged in that they are acting as one" (GMDC Opp. 23), amount to such evidence.  An attorney "need not disclose every past or remote connection with every party in interest."  *In re El San Juan Hotel Corp.*, 239 B.R. 635, 647 (1st Cir. B.A.P. 1999), *aff'd*, 230 F.3d 1347 (1st Cir. 2000).  Rather, an attorney need disclose only those connections "presently or recently existing, whether they are of business or personal in nature, which could reasonably have an effect on the attorney's judgment in the case."  *Id.*; *see also In re Roger J. Au & Son, Inc.,* 71 B.R. 238, 242 (N.D. Ohio 1986) (failure to disclose facts material to a potential conflict may provide independent ground for denial of fees, apart from the actual representation of competing interests).  The connections between Morrison and P&Z were limited and unrelated to the present action.  There is nothing to suggest that these connections affected P&Z's judgment in this case or, more importantly, were causally related to any inadequacy of P&Z's representation of GMDC's interests.

Furthermore, even if GMDC were able to demonstrate an undisclosed conflict, it would not require this Court to overturn the Bankruptcy Court's exercise of its discretion in reducing fees by only 40 percent. A majority of courts have found that a bankruptcy court has discretion over how much to reduce fees in the case of an undisclosed conflict. *See In re El San Juan Hotel Corp.*, 239 B.R. at 648 ("[T]he First Circuit Court of Appeals has declined to adopt a *per se* or brightline rule invariably requiring denial of all compensation because of a conflict of interest, recognizing that bankruptcy judges, being on the front line, should have wide discretion in regard to professional employment issues."); *In re Crivello*, 134 F.3d 831, 837-38 (7th Cir. 1998); *In re Lewis*, 113 F.3d 1040, 1045 (9th Cir. 1997); *Gray* v. *English*, 30 F.3d 1319, 1324 (10th Cir. 1994). *But see In re Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1319-20 (6th Cir. 1995). More recent cases in this Circuit have followed the majority approach. *See Bernheim*, 2007 WL 1858292, at *1; *Iannotti* v. *Mfrs. Hanover Trust Co.* (*In re N.Y., New Haven & Hartford R.R. Co.*), 567 F.2d 166, 175 (2d Cir. 1977); *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42-43 (Bankr. S.D.N.Y. 1998), *aff'd*, 246 B.R. 176 (S.D.N.Y. 2000). Complete denial of fees may be within the permissible range of discretion in response to a serious undisclosed conflict, *see, e.g.*, *In re Angelika Films*, 227 B.R. at 45, but is not required, *see, e.g.*, *In re Leslie Fay Cos.*, 175 B.R. at 539. GMDC has failed to present any law to support its position, and similarly has not proven how,

given this record, the Bankruptcy Court erred by not declining to award P&Z any fees.[23]

### b.  The Bankruptcy Court Did Not Err in Not Imposing Further Reductions

GMDC's fallback position fares no better.  Specifically, GMDC suggests that the Bankruptcy Court erred in not imposing further reductions in light of proffered deficiencies (both substantive and billing-related) in P&Z's fee application.  (GMDC Opp. 25-34).  It did not.  As an initial matter, GMDC's argument overlooks the fact that several of its substantive challenges to the fees are inextricably bound up in the Bankruptcy Court's ultimate decision to reduce P&Z's fees by 40 percent in order to account for concerns about GMDC's exclusion from Committee deliberations and, more broadly, P&Z's representation of the Committee and its constituent members.  (*See, e.g.*, *id.* at 28-30 (challenges to fees submitted for advice and updates provided to the Committee), 30-31 (challenges to fees for appearing at hearings on behalf of entire Committee), 31 (challenges to fees for Committee meetings, from which GMDC claims to have been excluded), 32-33 (challenges to fees for rejected confirmation plan), 33 (challenges to fees for retaining accounting firm and broker that GMDC was not permitted to interview)).  More fundamentally, Judge Glenn carefully reviewed GMDC's billing-record objections in connection

---

[23]    During the confirmation hearing, the Bankruptcy Court discussed specifically with counsel for GMDC the alternative of reducing fees, rather than denying them altogether, based on non-disclosure of a conflict.  (*See* Hr'g Tr. 26, 31).  Because the Bankruptcy Court did not err in finding no breach of any disclosure obligations, it did not abuse its discretion in declining to reduce the fees on that basis.

with the confirmation hearing, and challenged GMDC attorneys Rosen and Brown concerning the substance of several of the billing-record objections. (*See, e.g.*, Hr'g Tr. 43 (Bankruptcy Court observing that part of the reason for extensive professional fees in this proceeding was because attorney Brown had "actively participated and opposed much of what the debtor was proposing before the case was converted to Chapter 11"), 44 (Court noting Code provisions that permit "convenience classes" for certain creditors)). Finally, Judge Glenn discussed in detail with the U.S. Trustee the latter's in-depth review of P&Z's fee application and of GMDC's objections thereto, which review had resulted only in modest, voluntary reductions. (*Id.* at 13-15). In these respects, the Bankruptcy Court did not abuse its discretion.

### 4. The Bankruptcy Court's Decision Was Within the Permissible Range of Decisions

In determining whether a judge's decision is within the permissible range of decisions, the reviewing judge must examine the applicable law carefully:

> This determination that the range of acceptable decision-making has been exceeded in a particular case is assuredly one of law, but it is analytically distinct from a determination that a legal standard applicable to a generality of fact situations has been ignored, incorrectly applied, or inadequately applied in a particular case.

*Zervos* v. *Verizon N.Y., Inc.*, 252 F.3d 163, 169 n.6 (2d Cir. 2001) (holding that the lower court did not issue a decision that fell outside the permissible range of decisions because the plaintiff had not proven one of the two prongs necessary to prevail in a preliminary injunction hearing).

That the Bankruptcy Court decision was well within the permissible range of decisions is clearly supported by the case law. Courts may utilize a

percentage reduction in fee award determinations, as the Bankruptcy Court did here.  As the Second Circuit has stated, a court "may exercise its discretion and use a percentage deduction as a practical means of trimming fat from a fee application."  *McDonald* v. *Pension Plan of NYSA-ILA Pension Trust Fund,* 450 F.3d 91, 96-97 (2d Cir. 2006) (upholding a fee reduction of 35 percent). Indeed, "[a]cross the board percentage cuts in the fees claimed are routinely utilized" by courts.  *In re Baker*, 374 B.R. 489, 496 (Bankr. E.D.N.Y. 2007) (reducing fees by 20 percent for a court-approved auctioneer who auctioned off debtor's estate); *see also In re GSC Grp.*, 502 B.R. 673, 750-51 (Bankr. S.D.N.Y. 2013) (reducing fees by a total of 25 percent for vague billing entries and as a penalty for inadequate disclosure); *Klimbach* v. *Spherion Corp.*, 467 F. Supp. 2d 323, 332 (W.D.N.Y. 2006) (applying a 10 percent across-the-board reduction for vague billing entries in an insurance case).

The Bankruptcy Court's determination to reduce the fee based on P&Z's failure to convene meetings and provide notice to GMDC, and the Court's concern that this failure evidenced broader deficiencies in the representation, is also within its discretionary authority.  *See, e.g.*, *Heller* v. *Emanuel (In re Emanuel)*, 450 B.R. 1, 7-8 (S.D.N.Y. 2011) (upholding bankruptcy court's decision to deny motion for legal fees because attorney had failed to show any tangible benefit he provided to the debtor's suit and because attorney had failed to turn over files to debtor's new attorneys, causing prejudice to debtor's right to new trial).  Despite GMDC's repeated requests for bylaws, P&Z did not implement them.  (R. 297, Ex. C & D).  In addition, P&Z did not ask for

GMDC's vote when deciding which accountant to retain because they assumed that GMDC would have voted against the accountant proposed.  (R. 297, Ex. G).  And numerous emails suggest that P&Z focused on advising and obtaining consent from the two smaller creditors, to the (inappropriate) exclusion of GMDC.

Conversely, the record is nothing like those circumstances where courts have been found to have abused their discretion.  *See In re Smart World Techs. LLC*, 383 B.R. 869, 877-78 (holding that bankruptcy court had erred as a matter of law by misapplying the standard of 11 U.S.C. § 328).  By contrast, the Bankruptcy Court here decided the fee based on 11 U.S.C. § 330, under which the deciding court has considerably more latitude to consider quantitative and qualitative factors.  As there is more than "a reasonable basis in the record to support the propriety," of the Bankruptcy Court's decision to reduce P&Z's fees by 40 percent, the Court must uphold that reduction.  *In re JLM, Inc.*, 210 B.R. at 23 ("The inquiry is not focused on whether the appellate court might have ruled differently if presented with the same evidence, but whether there is a reasonable basis in the record to support the propriety of the bankruptcy judge's decision.").

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's decision to reduce P&Z's fees was an appropriate exercise of its discretion.  As noted, however, the Court made an arithmetic error in using the aggregate fees and costs amount of $124,803.07 that was initially sought by P&Z, which did not reflect the

voluntary reduction of $2,412 undertaken in light of the U.S. Trustee's objections.  Accordingly, the order is vacated and remanded to the Bankruptcy Court for the limited purpose of correcting the fee amount.

The Clerk of Court is directed to close the case.

SO ORDERED.

Dated:  September 2, 2014
      New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge